125 P.3d 66 (2005)
203 Or. App. 279
In the Matter of Ashley Jean Woodman, a Minor Child.
STATE ex rel DEPARTMENT OF HUMAN SERVICES, Respondent,
v.
Dana Jo SIMMONS, Appellant.
No. 4769J; A124081.
Court of Appeals of Oregon.
Submitted on Remand April 27, 2005.
Decided December 14, 2005.
*67 Wes Williams and Anne Morrison, for appellant.
Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General, for respondent.
Before HASELTON, Presiding Judge, and LINDER and ORTEGA, Judges.
ORTEGA, J.
The trial court terminated mother's parental rights to child based on mother's history of drug use, her mental illness, and her failure to effect a lasting adjustment of circumstances detrimental to child. On de novo review, we affirmed without a written opinion. State ex rel Dept. of Human Services v. Simmons, 196 Or.App. 787, 106 P.3d 699 (2004). Mother petitioned for review, and the Supreme Court vacated our decision and remanded for us to reconsider this case in light of State ex rel SOSCF v. Stillman, 333 Or. 135, 36 P.3d 490 (2001), and State ex rel Dept. of Human Services v. Smith, 338 Or. 58, 106 P.3d 627 (2005). State ex rel Dept. of Human Services v. Simmons, 338 Or. 374, 110 P.3d 113 (2005). On remand, mother maintains that none of her problems *68 are seriously detrimental to child and that the number of witnesses who appeared on her behalf and the strength of their testimony prevent the state's evidence from being clear and convincing, as required to support termination. We disagree. Because mother's evidence lacks sufficient credibility and persuasiveness to overcome the ample and convincing evidence that mother's past conduct and her mental illness and addiction are seriously detrimental to child, we affirm the trial court's termination of mother's parental rights.
A lengthy rendition of mother's and child's history is necessary to give context to our conclusions regarding the need for termination. Mother was 38 years old at the time of trial. She has had serious medical problems, including a lupus-like disorder, for most of her life, and has been on pain medications for many years. Child was born at the end of mother's decade-long abusive relationship with child's father, and mother left father while child was still an infant.[1] Mother and child lived in a number of different places, either alone (with paid in-home assistants) or with relatives who helped provide care for mother and child. Mother has not worked during child's lifetime but instead receives disability benefits. During the time that child lived with mother, mother was rarely without a caregiver who would help her with daily activities such as laundry, cooking, cleaning, and caring for child. Mother sometimes hired outside caregivers and sometimes paid her family members to perform these tasks for her.
Mother's abuse of drugs mainly involved Oxycontin, a controlled, prescription-only pain medication. To understand mother's history of substance abuse, it is helpful to understand the ways that Oxycontin can be abused. Because of its potential for abuse, a doctor can prescribe only one month's supply of Oxycontin at a time. It is intended to be taken orally and, if used properly, has a "time-release" effect, which provides pain reduction over time. If it is crushed, chewed, dissolved, or melted, it loses its time-release feature and gives to the user an almost immediate euphoric feeling, while also relieving pain. If used in large doses, it can result in heart failure.
Oxycontin is widely available on the streets. It can also be illegally obtained over the Internet and is available in quantities larger than the one-month doses that doctors are allowed to prescribe. Although a similar drug can be administered through a skin patch, preventing some of the methods of abuse, even the patch can be abused. A person can dissolve the patch, concentrate the liquid, and inject it, or even cut the patch into pieces and put it under the tongue.
There is no way to know, from physical exams or common laboratory tests, whether a person is abusing Oxycontin. The only outward signs of Oxycontin abuse are narcotic-seeking behaviors, such as filling prescriptions too early, continually "losing" prescriptions, or going to multiple doctors or pharmacies for the same prescription. Oxycontin is an opiate and, when abused, its side effects typically include drowsiness. The kind of urinalysis that will detect the presence of Oxycontin is not done by all screening laboratories.
With that understanding of Oxycontin abuse, we turn to the events that led to the termination of mother's parental rights. By way of overview, child was born in 1995, the year that mother turned 30. Child was placed in foster care at age six in June 2001, and, for the next 14 months, DHS provided services to mother and child with the goal of reunification. At that point, DHS decided to proceed toward termination; trial was held in October 2003, and judgment was entered in January 2004.
It is helpful to divide the relevant history into three time periods: (1) the drug abuse and domestic violence that led to child's removal in June 2001; (2) mother's evidently continuing drug abuse and drug-seeking behaviors up until her hospitalization in February 2002; and (3) the improvements in mother's behavior following that hospitalization and her mixed successes in treatment.
We begin by addressing the events that led to child's removal and its aftermath. *69 Mother lived with her older sister, Barton, in Everett, Washington, during most of the first five years of child's life and, while there, began seeing Dr. Stoller in 1999. Stoller prescribed multiple drugs for mother, including Oxycontin. In July 2000, when Barton became unable to assist mother and child, they moved to Baker City, Oregon, to live with mother's younger sister, Dahlem. Initially, mother did not establish a new primary care doctor in Oregon, but rather continued to obtain her pain medications from Stoller in Everett, even though she was not having routine office visits with him.
Mother's drug use and her volatile relationship with Dahlem spiraled out of control shortly after the move, prompting the Department of Human Services (DHS) to become involved. Dahlem was functioning as a paid caregiver for mother, preparing three meals a day, dispensing mother's medications, doing the laundry, keeping the home clean, and caring for child. The month after mother's move to Oregon, during an intake assessment with New Directions Northwest, an outpatient drug treatment provider, mother admitted that she had been abusing Oxycontin by injecting it and was seeking treatment at Dahlem's request.[2] The following month, a caller reported to DHS that mother was having verbally abusive exchanges with Dahlem and that child had seen mother "shooting herself" in the bedroom. Mother admitted to the investigating DHS worker that she had abused Oxycontin in the past but, because she explained the disputes between herself and Dahlem to DHS's satisfaction and because mother had paid caregivers in the home with her and child who it seemed would be able to monitor child's safety, DHS did not intervene further.
Three months after the move to Oregon, Stoller confirmed with mother's pharmacist that she was engaging in narcotic-seeking behaviors, so he switched her to the harder-to-abuse skin patch, rather than oral Oxycontin. Mother responded by finding a new primary care physician, Dr. Hart, while apparently continuing to obtain some prescriptions from Stoller. Hart had just completed his medical residency at the time and was new to medical practice. Mother led him to believe that she had moved to Oregon within the last month and asked him for refills of oral Oxycontin. Hart met with mother once and gave her new prescriptions for her various pain medications.[3] Hart knew that Oxycontin was subject to abuse and was highly addictive, but nevertheless refilled mother's Oxycontin prescription once in November and once in December 2000. During the same time period, Stoller apparently continued giving mother prescriptions for other forms of pain relief, including the Oxycontin skin patch.
Mother and child eventually moved out of Dahlem's home and began living with Miller, a recovering drug addict who served as mother's daytime caregiver. In December, Miller smelled something burning and followed the smell to mother's bedroom, where she observed mother behaving strangely. Miller also found an uncapped, "loaded" syringe hidden in a basket of clothes in mother's bedroom. The syringe contained a "clear to burnt color" substance; the needle was uncapped, the plunger was out, and it was ready to be used. The police were called, and police and DHS workers responded. When they arrived, mother claimed that it was an old syringe, full of Oxycontin. But the officer who examined the syringe noted that it was still filled with liquid that could be injected; the contents of the syringe had not dried or solidified. Police also found mother's prescription bottle for Oxycontin, which should have had about 40 pills in it. There were only 10 tablets left. Police confirmed with Hart that mother should have had more medication remaining than she did.[4]
*70 In light of these events, Miller asked mother to leave the residence. As mother was packing her things with the assistance of her drug counselor, the counselor found a spoon with burnt, powdery residue on it and gave it to the officers. When later questioned about what was going on with her Oxycontin, mother told the investigating DHS worker, "I do what I have to do." She maintained that she did not feel that she had a problem with drugs, prescription or otherwise. Nevertheless, she admitted to having smoked methamphetamine in the bedroom at Dahlem's house earlier in the month. Mother was charged with possession of a controlled substance, because she had altered the form of her Oxycontin.
After injecting an altered form of Oxycontin again the following month, in January 2001, mother entered into a service agreement with DHS requiring, among other things, that she attend inpatient drug treatment. In February, she went to the Eastern Oregon Alcoholism Foundation for inpatient drug treatment, taking child with her. However, in her intake assessment mother lied about her drug history, indicating that she had last abused Oxycontin four years earlier.
The goal of mother's inpatient treatment was to manage her pain legally, without abusing pain medication. However, mother lasted only three weeks of the 90-day program before she was discharged for insubordination and drug-seeking behavior. According to the treatment records, mother, on entering the program "immediately went into victim stance in order to avoid engaging" in treatment and "repeatedly chose to ignore or defy the rules." During their three-week stay in the program, it was also noted that mother "asks [child, then age six] to do things that are mom's responsibility" and that child "appears to often be the caregiver for her mother."
The program also noted questions regarding mother's prescription drug use. During treatment, mother was using Toradol, which is an injectable pain medication. When the program sought to confirm mother's prescription for it with Stoller, he reported that his Toradol prescription had long been discontinued and that the program could destroy all needles. Indeed, Stoller had discontinued mother's prescription for that drug four months before her admission to drug treatment, and Hart had never prescribed that drug, so it was unclear how mother was obtaining Toradol.
Mother also engaged in narcotic-seeking behaviors during treatment. Although her contract with the program provided that she would not ask for more drugs than were prescribed, mother more than once attempted to use the phone when she was not authorized to do so in order to call a physician to seek more medicine. After she was finally terminated from the program, in large part for those behaviors, mother returned with child to Baker City.
A month after her return home, mother went to the hospital to try to obtain codeine. She was told to wait until Stoller was back in his officebut she was back at the hospital a week later, seeking a change in her medications during Stoller's absence. She was again advised to wait for Stoller and to initiate a relationship with a local primary care physician. Meanwhile, mother essentially stopped participating in drug treatment. She was to re-enroll in New Directions Northwest on her return to Baker City, but cancelled several appointments.
During the same time period (spring and summer 2001), Dahlem was coming to mother's home frequently. Their relationship was quite volatile, with both women often becoming angry and yelling at each other. Child was present during most of those confrontations, which frequently concerned mother's care of child.
Sometime during the spring of 2001, mother began employing a new daytime caregiver, Moss. Moss would come to mother's home in the morning and often would have trouble waking motherindeed, eventually she got her own key because of that problem. Moss and mother had an arrangement by which Moss was supposed to have control of mother's pain medications and syringes at all times. In May 2001, Moss cleaned mother's home extensively, including dresser drawers, and then left on her honeymoon for a week. She counted out mother's prescription medications *71 and left just enough of each drug to ensure that mother had enough for the week that Moss would be gone. Nevertheless, Moss got a call from mother halfway through her honeymoon complaining that she had run out of certain medications. During roughly that same time period, mother's evening caregiver also smelled methamphetamine in mother's home.
When Moss returned from her honeymoon sometime in early June, she found four syringes, with needles intact, in child's bedroom dresser drawer. She also found a pill bottle with the label peeled off and some prescription medications hidden under a paper towel. The medications should not have been in mother's home, as Moss was to have control over all medications.
Moss tried to confront mother immediately about the needles, but mother was asleep on the couch and Moss could not wake her. Moss took the needles, put them in a box, and threw them in an outside dumpster. Less than a week later, however, Moss found the same four needles back in mother's home, underneath the bathroom sink. Mother initially explained having the needles by saying that she had found them while cleaning out an old bag. She said she put them in child's dresser because she did not know what else to do with them. She explained later that she had retrieved the needles from the dumpster because she was concerned that someone might find them and, afraid that "it was a federal offense to throw needles away," she brought them home.
Finally, events escalated to the point that child was removed from mother's care. During that same time period in June 2001, DHS responded to a telephone report that child had watched mother "shooting up" and had been staying at a neighbor's home for a few weeks because she was afraid and did not want to go home. The call coincided in part with what Moss had just encountered, although it does not appear that Moss had reported finding the needles at the time the other report came in.
DHS immediately responded to the call and found child at the neighbor's house, where she reportedly had been spending a lot of time. Child told the investigating DHS worker that she was afraid to go home because she had seen her mother at the kitchen table with a glass of water, a "spoon with white stuff" in it, and a sharp needle. She had seen her mother put the needle on the spoon and put the white, "chewing gum" stuff into it and then poke herself on the hand with the sharp needle. Mother had repeated this several times. Child showed the DHS worker on a diagram where mother had put the needle into her hand and was able to remember that mother had done this, at various times, "in the house at the kitchen table, on the microwave, in the bedroom on top of the dresser * * * and in the bathroom." Child recounted that the family cat had once knocked the needle and spoon off of child's dresser in the bedroom onto the floor. Visibly upset as she described these events, child also told the caseworker that mother would sometimes set a timer for an hour and tell child to wake her when the timer went off, leaving child to play unattendedbut then child would be unable to wake mother when the timer went off and would become frantic, believing that mother was dead.
DHS also interviewed Moss and learned about the four needles in child's dresser drawer. Moss reported as well that, on four occasions that month, child's elementary school had called her because mother had neglected to pick child up from school. Moss had picked up child and returned to the home to find mother either asleep or "out of it" sitting on the couch.
When the DHS caseworker went to mother's home, she found mother asleep on the couch and had trouble waking her, even though she was sleeping right near the door where the caseworker was knocking loudly. Next to the couch was a small mirror and a bloody tissue. DHS sent mother for a urinalysis, and the initial result was positive for methamphetamine. Child was placed in a local foster home, and mother entered into another service agreement with DHS on June 14 requiring her to maintain a clean and safe home, engage in outpatient drug treatment, consult with a doctor about her drowsiness, stop abusing drugs, and participate *72 in Alcoholics/Narcotics Anonymous.[5]
We proceed to discuss the second relevant time period in mother's history, the first eight months following child's removal. During that period, mother apparently continued abusing drugs and engaging in drug-seeking behavior. The week after child was removed, DHS and the Baker County sheriff's department searched mother's home with her consent and found a small bindle of methamphetamine wrapped in foil and some needles in her purse. There were "drug records and prices" on a sheet of paper as well. Mother at first claimed that she didn't know how the methamphetamine had gotten into her purse and that she had cleaned out her purse within the last two or three weeks. Later, she claimed that she had been working undercover for the local drug task force and was making buys so that she could give the drugs to the police.[6] However, that claim was never substantiated and was not credible; the state presented evidence that a person doing "controlled buys" for the task force would never have drugs in her possession in the way that mother did.
When she finally resumed treatment with New Directions Northwest after that search, mother was still maintaining that she did not need treatment. She insisted to the intake counselor that she was not an addict, although she admitted that she had relapsed on Oxycontin the prior December. Yet, around the same time, mother's mother, Wilderman, told DHS that mother was in trouble financially, had spent $1,300 in the first five days of that month, and had not paid bills. Wilderman said that she was controlling mother's finances and that mother was crossing out names on checks and making them out to others.
In mid-August, mother went to a local hospital to try to obtain oral Oxycontin, and, when a nurse practitioner refused to give it to her and told mother that she should continue using the skin patch, mother became angry and tore off the patch. At the end of August, mother returned to the hospital seeking an injection for what she claimed was an exacerbation of her vasculitis, but the nurse practitioner determined that mother had been picking her skin to the point of creating ulcerations and declined to give her the injection. Mother reported that she was self-increasing the dosage of one of her other drugsand a few weeks later she was back in the emergency room with a similar skin complaint, apparently seeking the same injection. She also requested a note to give to DHS to verify that she had been unable to attend classes recently due to fatigue, a fact that was not within the knowledge of the nurse practitioner. The nurse practitioner urged mother repeatedly on each of these occasions to set up a relationship with a local physician.
Shortly after child's removal, DHS arranged for both child and mother to be assessed by Dr. Sweet, a psychologist. Sweet interviewed child and did some intelligence and personality testing. Child had an IQ score of 91, which was average. On a projective test that required child to tell stories about pictures, child used themes that suggested that she was sad, angry, and depressed. She was worried about where she was going to stay, was confused about relationships, and was worried about how she was going to take care of mother. Child told Sweet, "I don't care when I go back" to mother's home; although she indicated that she was "ready to go now," she was not sure if she really wanted to. Sweet was concerned that this six-year-old child, with her "extremely limited experience and ability," was being forced to "be a mom to her mom," which he did not think was appropriate. He diagnosed child with adjustment disorder with mixed anxiety and depressed mood.
Sweet also interviewed mother and conducted several standard tests. He noted that mother's skin was covered with scars *73 and bruises and that she was trembling throughout the session. During the interview, mother "had a great deal of difficulty focusing and often did not respond directly to [Sweet's] questions or would become tangential." After several attempts, for example, mother was unable to answer the question of why child was in foster care, although she did say that one of her problems was that old syringes kept turning up in her possession when she would move from place to place. She also denied any history of methamphetamine use. In describing her therapy goals, mother spoke vaguely about "breaking cycles." She professed a belief that she was capable of resuming care of child again immediately.
Mother tested in the "low average" range of intelligence, with a score of 89. She had a significant deficit in verbal conceptual abilities and took three hours to complete the MMPI-2, which normally takes an hour and a half. Sweet observed that mother seemed to "make a concerted effort to appear in a favorable light, providing an extremely defensive profile in an obsessive woman." Despite mother's defensiveness, there were elevations on several significant scales. She experienced extreme distress and turmoil, and was very anxious, tense, and restless. Mother's projective drawings showed that she was "a very obsessive, controlling individual who approaches life in a rigid and naive manner."
Sweet found mother to be suffering from polysubstance dependence and major depression, and on "Axis II" made a "rule-out" diagnosis of personality disorder with characteristics of borderline and dependent personality features. It was clear to Sweet that mother was "overwhelmed by problems" and seemed "to be deteriorating in her cognitive functioning."
The following month, child began seeing counselor Waln for individual therapy. In their sessions, child frequently would make up stories that had a "good mommy/bad mommy" theme to them, including one in which a mother bird would lay eggs and then either not come back for them or leave them in unsafe places, such as underneath a snowman. Child also reported that she was afraid of doctors and needles and that, during a period when she lived with mother, she was afraid that mother would die. Child began experiencing enuresis, wetting herself several times during the day and night, when she had unsupervised visits with her aunt, Dahlem. She spontaneously disclosed to Waln that she was afraid of Dahlem, had seen Dahlem slap her own daughter, and feared that Dahlem would kill mother. Child also expressed fear that she would have to grow up in an orphanage and would never have a permanent home with a family. (That fear was not expressed as a fear that she would not be with mother.) Like Dr. Sweet, Waln concluded that child had been forced to assume a parental roleindeed, that she felt responsible for keeping mother alive. Waln viewed the daytime and nighttime enuresis as indicative of child's fear of Dahlem and of the stress that child felt to be responsible for her parent when she lacked the resources for such responsibility.
Child and mother began having supervised visits at the local DHS office soon after child was removed from mother's home. The visit supervisor who observed the first few such visits had some concerns about the way that mother communicated with child. For example, mother would explain everything to child with a lot of detail that was far beyond child's listening and comprehension level. Although child would be very loving towards mother during these long explanations and would try to sit and listen, she could not really do so. Mother would keep trying to finish her explanation anyway and would become frustrated when child would act silly or change the subject. Mother also teased child inappropriately about when child would be old enough to marry a boy in her class.
Over time, mother's visit supervisors at DHS continued to notice patterns of communication between mother and child that indicated a failure to recognize child's needs. For example, mother at times appeared not to be listening to child or wanted to talk with child about age-inappropriate topics, like how to pursue boyfriends, when child just wanted to play house or drive her doll in a toy car. Mother would often set an agenda for the visits and then was not responsive to child's *74 suggestions or questions. Mother likewise once had child dress up in a lace shawl, tied over her with just her underwear underneath, and dance to Britney Spears's music. On another occasion before the visit supervisor intervened, mother began to show child a movie that was inappropriate for a six-year-old.
In the meantime, mother was not successful in drug treatment. She attended only 35 of 75 classes offered, and the counseling notes indicate that she "appear[ed] to be uncomfortable in situations in which she [was] not the center of attention" and had feedback for everyone else about their problems but did not listen well. Early on, her treatment provider read in the newspaper about a "drug bust" in mother's home before mother mentioned it (missing earlier opportunities to do so) and, although mother was bumped up to a higher level of treatment as a result, "she would never admit that she had a problem," maintaining that she had the drugs as a result of working for the drug task force. Her prognosis for recovery was considered to be guarded.
Mother also continued to engage in drug-seeking behaviors. A new doctor, Dr. Neeley, began refilling oral Oxycontin and other medications for mother in Septemberand by November, mother called in 10 days early claiming that she had run out of Oxycontin. Again in December, mother called the doctor's office to report having run out of Oxycontin a few days early. Mother successfully persuaded another doctor to give her a three-day interim prescription and had that prescription filled, but then did not mention that fact to Neeley's staff when she called to request her normal refill two days later. Mother requested that her usual prescription be called in to a Rite-Aid pharmacy, and also asked for another 72-hour supply to be called in to Bi-Mart, in case she had trouble picking up the Rite-Aid prescription. Neeley checked with both pharmacies and learned that mother had been "flagged" at Bi-Mart as having used Oxycontin intravenously. She also learned that mother had been buying a package of 10 syringes from Rite-Aid every two weeks, with no known medical order in place that would have required such frequent use of syringes. Neeley chose not to refill the Oxycontin prescription until she and mother could meet in person. Mother set up an appointment for that conversation, but then cancelled the appointment, called in to offer excuses, and then apparently hung up on Neeley when the doctor expressed concern that mother was abusing Oxycontin. After that, mother terminated care with Neeley.
Then, when child was visiting mother's home in December 2001, the visit monitor discovered a syringe on top of the medicine cabinet, within child's reach, while using mother's bathroom. At that time, no medication prescribed for mother would have required her to use syringes. Two days later the police searched mother's home and found hypodermic needles in the bathroom and two bindles of methamphetamine and a drinking straw between the mattress and the box springs of mother's bed. Mother claimed not to know the methamphetamine was there and speculated that it must belong to her houseguest. On the way to the jail for booking, mother asked if she could work for the drug task force to make a drug case against someone else, in lieu of being charged. She was told "no."
Later that month, child was moved from her Baker City foster home to the Lake Oswego home of her paternal aunt and uncle, the Stubblefields. There were at least two reasons for the move. First, it was the only available and suitable relative placement. Second, mother had at one time agreed, with her attorney's support, that she would like to enter inpatient drug treatment in Portland, where she would receive better care for her multiple health conditions, and child's placement there would make visitation easier. Although mother was not happy with child's move,[7] by all accounts child has adjusted very well to placement with the Stubblefields.
*75 Immediately after moving to Lake Oswego, child continued her counseling with a new counselor, Dr. Portland, a local psychologist who specialized in dealing with children in foster care. Simultaneously, Waln, child's former therapist, was asked to begin a counseling relationship with mother. The primary purpose was to have Waln, who was already familiar with child, help mother learn how to reach minimal parenting standards and to begin to address some of the psychological problems noted by Sweet. However, mother made scheduling difficult; they met only once in three months, despite Waln's efforts to schedule more frequent meetings.
Mother's attendance at drug treatment likewise continued to be sporadic. By the beginning of February 2002, she was called in for an individual session because she had stopped showing up for treatment and had not enrolled in a more intensive program. Her counselor observed that mother "continues to try to manipulate the system" by wanting to have a conversation taped and to have her sister, Dahlem, with whom she had reconciled, participate with her.[8] Mother became defensive when the conversation turned to her level of denial and her inability to be honest. She wanted to explain all the details of her medical conditions as a reason why she should not be held accountable for her absences, but she failed to appreciate that her previous misuse of her medical conditions as an excuse to get out of class caused skepticism about her current claims. Finally, the program recommended that mother return to inpatient treatment.
Shortly after that, mother became suicidal. On February 8, she called a crisis hotline and reported that she was thinking about taking all of her prescriptions at once. With the assistance of an attorney and her sister, mother was admitted to an inpatient psychiatric hospital in Boise, Idaho, where she stayed for 16 days. Her medications were altered, and she also engaged in some drug treatment. By all accounts, mother was physically healthier and mentally clearer on her release than she had been previously. Everyone agrees that mother's hospitalization in Idaho represented a turning point of sorts, and that mother's behavior greatly improved on her release.
This brings us to the third relevant period in mother's history, the mixed evidence of her recovery on her release from the Idaho hospital. Mother urges the view that, from the time of her release, she transformed herself so completely as to remove any reasonable concern about her capacity to parent child. She attributes the agency's criticisms of her from that point forward to its own mishandling of the file or its unfair judgment of her, and she urges us to disregard such criticisms in deference to the more favorable view of her that was put forward by family members, her chosen counselors, and certain of the visit supervisors who contracted with DHS. However, we do not find the evidence to be as favorable to mother as she suggests. Although there is no question that mother made many positive changes following the Idaho hospitalization, the witnesses who spoke on mother's behalf lacked knowledge or credibility or both for assessing the extent and stability of her recovery and her ability to address child's needs, particularly in light of the harm that child has suffered as a result of mother's past conduct. In contrast, the record contains ample evidence establishing that mother has failed to adjust her circumstances sufficiently to safely parent child.
We begin by reviewing the evidence of the extent of mother's recovery. When mother returned to Oregon from Idaho, she returned to outpatient treatment with New Directions Northwest and was placed in level two, which required 12 hours per week of treatment. This time, mother's level of participation markedly improved; she attended groups, complied with recommendations, and completed that level. She participated in level one treatment from April to September 2002, and then graduated to self-directed recovery.
*76 Nevertheless, mother's treatment provider continued to be concerned about her ability to maintain sobriety, in part because mother still refused to admit to being an addict or abusing drugs. In May 2002, during her level one treatment, one of her counselors, Schacher, contacted DHS and reported that mother consistently saw herself as a victim and disclosed only information that was helpful to her. He notedconsistently with Sweet's earlier observationsthat mother had an extreme fear of not looking good to other people. So concerned was he that he asked to be present at any court hearings addressing return of child to mother, because "he does not believe [child] should be returned to [mother] at this time."
The discharge summary for mother in September notes that mother completed her assignments, obtained a sponsor, attended 12-step meetings, and produced clean urine tests. However, those clean urine tests would not have detected Oxycontin.
On her return from the Boise hospitalization, mother also engaged in the parent training program with Waln that DHS had arranged for her. Waln assessed mother, set some specific goals for her, and then began to work in individual sessions on helping mother accomplish those goals. The goals were to demonstrate the ability to (1) meet child's emotional needs; (2) support child's social needs; (3) meet child's safety needs; (4) perform basic parenting skills; and (5) meet child's physical needs.
After working with mother for six months on those goals, Waln concluded that mother did not have the ability to understand the difference between her own needs and child's needs. For example, mother would say that the role that child had been playingproviding care for mother and feeling responsible for her welfarewas a natural part of a mother/daughter relationship and that it was mother's way of teaching child compassion. She also denied that child was afraid of Dahlem, despite child's expressions of fear, and suggested that child was a liar for saying so. In mother's view, child should simply confront Dahlem if she was afraid of her. Mother also insisted that her drug use had not affected child.
Mother's assessment of child's needs was far from reality, however; the record amply demonstrates that child suffered lasting trauma from mother's drug abuse, that her view of herself as mother's caretaker was destructive to child, and that mother's volatile relationship with Dahlem caused child significant distress. Child told Portland in her intake assessment that she had seen mother use pills in a way that involved a spoon, a candle, and a "sharp thing." Child explained that mother had tried to hide what she was doing, but that she had seen mother use the "shot thing" to put the drugs into her hand. She also told Portland that she had tried to wake up mother, even shaking her, and when mother would not wake up, child had called 9-1-1. Child related that she would sometimes put her fingers in her ears and say "bah, bah, bah" to try to block out the sounds of the fighting between mother and Dahlem. Portland diagnosed child with post-traumatic stress disorder, in part because of these events. Portland also noted that child had perceived mother to be dead on at least one occasion and that child believed that mother might accidentally kill herself if child was not there to take care of her. Portland believed that, as a result of these experiences, child was a year and a half behind in emotional and social development.
Portland reached the conclusion, as had Sweet and Waln, that child is "parentified" that is, child has learned to care for her parent, rather than being cared for by her parent. In Portland's opinion, child has suffered emotional pain in worrying about mother's health and drug use and about mother's relationship with Dahlem. That pain was being expressed in irritability, defiance, and wetting her pants. The outlook for a child who has shouldered that kind of responsibility for taking care of a parent is that the child often is not able to identify her own feelings, needs, and thoughts separately from the parent's. The role that child was assuming left her "angry, anxious and depressed" and could lead to even worse problems in adolescence, such as higher risks of drug and alcohol use, pregnancy, and suicide.
Although visits between mother and child were in some ways positive, mother's inability *77 to put child's needs before her own often was evident. Sometime after child moved to Lake Oswego in December 2001, mother and child were visiting by phone for 15 minutes at a time, several times a week, with the calls being monitored by DHS. Although child seemed to enjoy the telephone visits "for the most part," on at least one occasion mother insisted on turning the conversation to her own interests even when child had something she wanted to express. Although mother tried to be very careful to follow restrictions that DHS had placed on her during those calls, she occasionally made inappropriate comments to child. For example, mother once told child that she wanted to make sure that child was fingerprinted and had recent pictures for identification purposes, because "[y]ou are so cute they would grab you right away." On another occasion, mother pressured child to share part of mother's visit time with Dahlem, despite child's expressed fears of her aunt. When child ventured that she was unsure if she wanted to do that and wanted a few days to think about it, mother insisted that child would have to decide sooner than that.
In-person visits sometimes occurred in Portland and sometimes in Baker City. Mother was given assistance with driving or riding the bus to Portland to attend visits, but was often dissatisfied with the way that transportation was arranged. Indeed, on several occasions mother expressed a desire not to travel to Portland for visits. For example, if child were going to be brought to Baker City on a Wednesday, mother would resist going to Portland for a visit the following weekend. Mother often expressed the desire that child do all of the traveling. On one occasion, mother did not want to make a scheduled visit because she did not want to miss a local festival that was going on in Baker City. Yet, when child had some social activities planned that prevented her from coming to Baker City, mother said, "Well, that's too bad. It just has to be cancelled." At one point, mother wanted to ask the court to cut off child's attendance at camps, sleep-overs, and out-of-state trips, because such things interfered with child's ability to travel to Baker City for visitation.
For several months beginning in May of that year, DHS paid for a Portland program, "Options," to supervise weekend visits between mother and child. The Options program arranged for mother to see child for five hours on Saturdays and two hours on Sundays, either at mother's Portland hotel (for which DHS paid) or at local attractions, such as the zoo, a water park, or the mall. The foster parents would bring child to mother's hotel, and then one of two Options workers would meet them and remain with mother and child throughout the visits. Neither of the two Options visit supervisors had read any background information on mother or child; neither was familiar with their psychological evaluations or the history of their relationship, and neither saw child on any other occasions.
In general, the Options visit observers came away with a positive view of mother's ability to safely parent, though their perspective was limited to the visits themselves. They noted that the two exchanged a lot of affection and that child often spontaneously expressed love for mother. They also noted many appropriate behaviors by mother, such as setting appropriate rules for behavior in the mall, keeping child safe in the pool, and coming up with activities that interested child. However, the Options visit notes contain indications that child continued to act as a caregiver to mother.[9] And on one occasion, mother overslept, and child and the visit supervisor had to come to mother's hotel room and bang on the door to wake her up, which frightened child.
Waln observed some of the Baker City visits between mother and child, and she, like *78 the Options workers, also noted that mother played well with child. She expressed "great concern," however, regarding child's absolute refusal to engage in any conversation or activity with mother that had emotional content. Child's consistent refusal to bring up her friends, her life, her disappointments, or things that she was happy about indicated to Waln that child does not feel safe with mother. As time wore on, child became increasingly "passive aggressive" with mother. For example, child deliberately broke two Easter eggs that she had made for mother and did not break any other eggs. She would sometimes play with mother too roughly and actually hurt mother. Once, mother drew a heart with chalk on the sidewalk and child became distraught, spontaneously insisting that mother not write "I love you [child]" inside the heart. Mother did so anyway, which prompted child to react defiantly, dropping and rolling the chalk down the sidewalk. Waln believed that mother should have honored child's wishes about not writing inside the drawing; she also believed that child was demonstrating passive-aggressiveness toward mother by her reaction.
Child's therapist, Portland, began to supervise some of the visits beginning in October. Portland observed that mother exhibited a lack of interest in child's progress and a lack of empathy. She, like Waln, noted that child seemed to assume a role of being happy and having fun with mother, whether or not that was child's true emotional state; Portland observed that child has a habit of telling people what they want to hear. She agreed with Waln's assessment that much of child's "happy" behavior during visits appeared to be "placating behavior," with child trying to fulfill mother's expectation that child should be happy. Child's foster mother, Mrs. Stubblefield, likewise testified that child came home exhausted from visits with mother, whether they occurred in Portland or Baker City, and that she would fall asleep within two to five minutes of getting into the car to go home. Stubblefield felt that this was less an issue of being tired than of anxiety about the visit and then "shaking it off" afterward. Child commented to Stubblefield that "her brain [is] tired" after visits and that it "[takes] a lot of energy" to visit with mother.
As mother improved her circumstances, she grew more rather than less aggressively resistant to cooperating with DHS, and Dahlem often advocated for her in that regard. Indeed, in contrast to mother's earlier eagerness to participate in services, she expressed to Waln the view that, now that she had addressed her drug use, child should be returned to her immediately as a sort of reward for her efforts; mother evinced no understanding of child's need for therapy or of the need for any other efforts to ensure child's safe return. She refused to sign any further service agreements as of June 2002, even after her attorney approved the agreement that DHS proposed (which was similar to prior agreements). That last agreement required her, among other things, to meet weekly with Waln, to submit a budget and then weekly budget updates to her caseworker, to maintain her own home (including doing her own laundry), and to attend AA/NA groups. Mother asserted that she would "cooperate" with the agreement without signing it, but her cooperation was inconsistent. She did establish her own home that everyone agrees would be suitable for child, but resisted the budgeting and laundry requirements. More significantly, mother dropped out of AA/NA classes, concluding that individual counseling with a pastoral counselor, Cross, was an acceptable substitute.
As noted above, mother's participation in outpatient treatment after the Boise hospitalization was more consistent than it had been previously, but it was still selective; her counselors at New Directions Northwest reported that she continually cast herself in the role of victim and insisted that she was not an addict. After completing the program, she opted for regular sessions with Cross and her pastor, Saunders, instead of attending AA/NAyet the record indicates that neither Saunders nor Cross possessed a basis for assessing and treating either mother's psychological problems or her addiction.
It was particularly evident at trial that Cross lacks the training to confront the type of denial that presented a concern to mother's other counselors and instead reflects back to mother the view that she wants to *79 have of herself. Cross initially identified himself (including in written reports) as holding a "Ph.D.," until it was determined that he actually had a "doctorate in Christian counseling" from a nonaccredited correspondence program. Cross had received no clinical training in counseling, did not write a dissertation, and has no certification to do drug or alcohol treatment. He testified to the opinion that child should be returned to mother "because she's mom," although he has not observed mother with child except in passing while attending church services, and his sessions with mother focused on spiritual counseling. We do not question that such counseling was beneficial to mother. However, neither of mother's chosen counselors (Cross and pastor Saunders, whom she began seeing for weekly counseling in December 2002 and who considered mother a suitable babysitter for his own children) demonstrated that they possess the training or insight to evaluate her recovery or to hold her truly accountable.
Sweet evaluated mother again in July 2002, at DHS's request. At that point, child had been in foster care for 13 months, and the time was approaching when DHS was statutorily required to proceed toward termination of parental rights unless there was a compelling reason for determining that termination would not be in child's best interests. See ORS 419B.498.[10] Sweet's evaluation apparently was intended to assist in that assessment.
Sweet noted this time that mother responded "more appropriately" than she had in their previous session. She was able to explain the reasons for child's placement in foster care, admitting that she had been abusing her pain medications and "shooting up" her Oxycontin. She admitted that she had last relapsed on Oxycontin sometime after child had been removed and placed in foster care in June 2001, and she acknowledged that she and Dahlem had not gotten along in the past, although she asserted that their relationship had improved greatly.
Mother's IQ test showed results similar to her prior testing, and she was able to complete the MMPI-2 more quickly than previously. Nevertheless, she still provided a "very defensive profile," and the results suggested again that she is "a very rigid, overcontrolled woman." In addition to the diagnoses that he had made on mother's prior visit, Sweet made an affirmative diagnosis of personality disorder with borderline, dependent, and narcissistic features.[11] Sweet noted that mother was still unwilling to take full responsibility for her drug abuse, instead blaming it in part on the dental work that she had been having done at the time of child's removal. Importantly, he observed that mother "seems to have no clue as to how [her drug abuse] might affect her child." Although he commended mother's work on her drug dependency problems, Sweet noted *80 that mother's complete failure to grasp child's needs or to take responsibility for her past drug abuse were indicative of her personality disorder and that such disorders are extremely resistant to treatment. He concluded that, although mother was making some progress, that progress was not moving quickly enough to suggest that mother would be ready to parent child within a reasonable time.
Waln also prepared a report in October 2002, addressing the goals that Waln and mother had set six months earlier, to assist DHS in making its required assessment of whether child could safely be returned home within a reasonable time. After 17 individual sessions with mother, Waln viewed her case as "one of the most serious" that she had dealt with. First, as to mother's ability to identify and support child's emotional needs, Waln concluded that "[mother] has not demonstrated that she is able to support [child's] feelings or that she can identify [child's] feelings." As an example, Waln noted that mother had faulted child for her fear of Dahlem and had told child that she had hurt Dahlem's feelings by claiming to be afraid of her. Indeed, both mother and Dahlem insisted that child was a liar for asserting such a claim.[12] Mother had also repeatedly insisted to Waln that child had never seen mother abuse drugs, even though child could describe mother's drug use in detail. And although mother had spoken to Portland about child's progress in therapy at Waln's suggestion, mother was unable to report on child's therapy except to suggest that child was lying to her therapist.
Mother fared no better on the remaining goals. As to mother's ability to meet child's emotional needs, Waln concluded that mother expected Dahlem or her caregivers to help her do this, rather than to do it herself. In fact, Waln observed that mother seemed to lose her ability to focus on child in Dahlem's presence, relinquishing her parental role to Dahlem. As to the related goal of having mother learn to separate her own emotions from child's, Waln concluded that mother continued to "confuse[] [child's] feelings with her own." For example, she noted that mother reported that child "sobbed and clung to" mother when leaving a visit that Waln had observed. When Waln confronted mother on this, noting that child did not even have tears in her eyes and that typically child had little trouble parting after visits, mother responded that child had wanted to cry and that "a mother can tell." By contrast, Waln had observed that mother had clearly been in distress but child had parted cheerfully.
Waln concluded that the goal of understanding child's other relationships was "partially met," because mother was at least very interested in maintaining child's ties to mother's family. However, she was unwilling to address child's fear of Dahlem and often pressured child with questions about the Stubblefields' plans. As to the goal of performing basic parenting skills, Waln likewise concluded that mother's ability was limited. She observed that mother "is able to carry out new skills if they are presented as a `rule'" but "has not demonstrated the ability to grasp the concepts underlying the skill, adapt the new skill to like circumstances, or maintain that skill over time." As an example, Waln noted that mother had been able to follow visitation rules from March to August 2002, but then had begun to revert to talking to child about mother's own health and badgering child about issues that child could not control, such as how long child would be allowed to stay in Baker City or whether or not child would get her hair cut, rather than addressing such issues with DHS or with the Stubblefields. When child eventually was given a haircut by the Stubblefields, she was very distressed about letting mother see her hair and tried to hide the haircut. Waln felt that mother was asking child to assume control of "adult decisions that a little child can't promise."
*81 Although the Options workers seem to have come away with a more positive view of mother's ability to parent child than Waln did, Waln did not find their observations to be inconsistent with what she observed. Waln explained that she, too, had seen child spontaneously express affection and behave in a loving way toward motherbut from her context of having counseled both child and mother, she viewed those as "placating expressions" on child's part. She noted that child did often cling to mother and say that she did not want to leave her and that she wanted to return home, but did so "without context and without emotional affect." An example of child's placating expressions occurred at the end of one visit, when mother commented, "Now, here is the sad part," and child responded by reassuring mother that "it doesn't need to be sad" because they had just visited for two days in a row. On another occasion, Waln noted that child anxiously explained to mother that her new haircut was just trimmed, not cut, because she knew that haircuts tended to upset mother. Waln believed that child's placating behaviors were very consistent with her former caregiving role.
Sweet also evaluated child again in July 2002. He observed some positive changes (including that her IQ score had jumped 20 points), but noted that child was still depressed and worried. She was still ambivalent about returning to mother's home, commenting that she felt "kind of sad, but not that sad" about not living with mother. Life with mother, child remembered, had been "[g]ood, not so good, and bad" at various times. Child remembered that the problems at home occurred most when mother had boyfriends, because "[s]he started doing drugs a lot more around them." She also remembered being very frightened when she tried to shake mother to wake her up and "[s]he just sat there."
Sweet concluded that child's diagnoses remained the same, but that she was making progress. He noted that, although child's remaining concerns about mother were not unreasonable, they were a reflection of the fact that she had essentially been mother's caretaker in the past. He emphasized the importance of mother's being able to demonstrate that she would become child's caretaker, not vice versa, if child were returned.
Mother continued to exhibit denial of her addiction and the harm suffered by child up to and during trial. At a hearing in July 2003, she claimed to have been clean and sober since January 10, 2001, despite the ample evidence of drug-seeking behavior and drug use at least up until her hospitalization in February 2002, including the incidents that led to child's removal in June 2001. She also claimed at that hearing never to have used methamphetamine, despite having admitted to methamphetamine use on other occasions.[13]
Mother continued to maintain at trial that she had been clean and sober since January 2001. Although she professed at trial to agree that she is an addict, her generally defensive testimony suggested that she was trying to rebut the view expressed in her drug counselors' reports that she does not "seem to understand the disease concept," while proceeding nevertheless to deny most of the evidence of her drug abuse. She continued to deny methamphetamine use, except for one occasion that was "so long ago, I really do not recall." When asked to explain the four needles found in child's dresser in June 2001, mother again insisted that they were old needles that she had found while cleaning out her possessions. As to child's statements, made during the investigation of that incident, that she had seen mother use the needles to inject herself, mother still insisted that child was remembering past events, not events that had occurred in June 2001, and that child had been "upset" with her at the time of making those disclosures. She continued to insist that the methamphetamine found in her purse in June 2001 was as a result of work for the drug task force, and she disputed that the syringe found on top of her medicine cabinet was within child's reach. She also disputed Stoller's testimony that she had no medical need for syringes in June 2001, insisting that he had his dates *82 wrong and that she could get the pharmacy records to prove it.
The trial court found that mother's drug addiction, coupled with her mental illness, has resulted in behavior that is seriously detrimental to child and that integration into mother's home is improbable within a reasonable time due to conduct or circumstances not likely to change. On de novo review, we affirm those findings.
ORS 419B.504 provides, in part:
"The rights of the parent * * * may be terminated * * * if the court finds that the parent * * * [is] unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child * * * for extended periods of time.
"* * * * *
"(3) Addictive or habitual use of * * * controlled substances to the extent that parental ability has been substantially impaired.
"* * * * *
"(5) * * * [F]ailure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."
The Supreme Court observed in Stillman and in Smith that both parts of the two-part test contained in ORS 419B.504 must be met before the court orders termination:
"First, the court must address a parent's fitness: The court must find that the parent is `unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is `seriously detrimental' to the child. Secondand only if the parent has met the foregoing criteriathe court also must find that the `integration of the child into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change.'"
Stillman, 333 Or. at 145, 36 P.3d 490; see also Smith, 338 Or. at 80-81, 106 P.3d 627.
We first address mother's fitness and find that mother's mental illness, along with her addiction to controlled substances, constitute conditions that are seriously detrimental to child. We are mindful that the "conduct or condition" at issue must have rendered mother unfit at the time of the termination hearing. Stillman, 333 Or. at 148-49, 36 P.3d 490.
We begin by addressing mother's drug addiction, which was the condition that led to DHS's involvement with the family and which clearly has had a lasting detrimental effect on child. Portland, Sweet, and Waln all observed that child has experienced persistent anxiety, daytime and nighttime enuresis, and developmental delays because of watching mother abuse drugs, being unable to wake her and believing that she might be dead, and assuming the role of taking care of her mother while being unable to rely on mother to care for her. Portland diagnosed child with post-traumatic stress disorder as a result of these events and testified that child now has special needs as a result of mother's drug abuse. Yet, since February 2002, mother has made commendable efforts to address her drug problem. Since that time, mother has not exhibited the drug-seeking behaviors that she formerly exhibited and has by all accounts functioned much more appropriately than she did prior to her February 2002 hospitalization.
In Stillman, the Supreme Court found that the father's history of drug abuse did not render him unfit at the time of the termination hearing because of his "sincere and substantial efforts to address his drug problem." Id. Mother makes the same argument to us now, and we applaud her efforts *83 to address her drug problem. However, the father in Stillman presented evidence that, after initially minimizing the significance of his addiction, he had made a significant turnaround in his attitude, had requested additional treatment after his first clinical course, and had "sincerely [come] to appreciate the effect that his drug use had had on his children and was addressing the deficits in his life so that he could maintain custody of the children." Id. at 141, 36 P.3d 490. Here, by contrast, mother continues to be dishonest about the extent of her past use and in denial about her addiction. She has consistently changed her stories about her drug usage and made excuses for her behavior; even at trial she was not truthful about her drug usage, continuing to deny various incidents that are overwhelmingly supported by the record. Even more seriously, she continues to deny child's accounts of her drug abuse and has developed no insight at all about the effect that her drug use has had on child.
It would be a close question on this record whether, given mother's efforts to address her addiction, mother's history of drug abuse is a conduct or condition that rendered her unfit at the time of the termination hearing. The record does not contain clear and convincing evidence that mother was abusing drugs at the time of the hearing; indeed, it appears that she had been clean and sober for an extended period of time. Nevertheless, as noted by Sweet and by her counselors at New Directions Northwest, mother's persistent dishonesty and denial about her addiction put into jeopardy the long-term success of her treatment and present a risk of relapse that is real and significant.
This case, however, does not rest solely on mother's addiction. In contrast to the father in Stillman, who lacked any serious psychological problems that would have prevented him from being a good parent, 333 Or. at 141, 36 P.3d 490, mother here suffers from a personality disorder with borderline, dependent, and narcissistic features. The record contains clear and convincing evidence that, even during a period of apparent sobriety, that mental illness rendered mother incapable of recognizing child's needs, including the effects of her drug addiction on child. Her illness is characterized by defensiveness, an inordinate need to be perceived in a positive light, an inability to take responsibility for her behavior, and an inability to understand and empathize with child's needs. Both before trial and during her trial testimony, mother consistently failed to display even a glimmer of insight into child's needs or how her behavior affected child.
Waln, whose task it was to assist mother in addressing that aspect of her mental illness, testified that mother made no progress in recognizing and addressing child's needs. Instead, mother regularly dismissed child's fear of Dahlem and insisted on involving Dahlem in unsupervised visits with child; told child that she had "hurt her aunt's feelings" and that Dahlem was mad at child for telling DHS that child was afraid of her; and dismissed as lies child's stories of being traumatized by seeing mother shooting up and being unable to wake mother. As a result of mother's persistent inability to recognize and address child's needs, Sweet, Waln, and Portland all observed that child became the parent in the relationship, a role reversal that causes her continuing anxiety, has delayed her emotional development, and exposes her to continuing problems such as the inability to identify her own feelings, needs, and thoughts separately from mother's. The role that child has assumed leaves her "angry, anxious and depressed" and feeling continuing pressure to placate mother,[14] and may lead to problems in adolescence, such as higher risks of drug and alcohol use, pregnancy, and suicide. Despite the efforts of Waln to address child's problems with mother, mother still views child's inordinate worry and feelings of responsibility for mother's care as appropriate rather than damaging to child. Mother remains unable to recognize *84 how her behavior has harmed child or to separate her needs from child's, much less to put child's needs ahead of her own.
This case is unlike Smith, in which the Supreme Court found insufficient evidence of detriment to the child at issue. In Smith, the psychologists who evaluated the mother did not conclusively diagnose her with an emotional or mental illness, and the mother's lack of progress in developing parenting skills did not render her sufficiently inadequate as a parent that her condition was seriously detrimental to the child. 338 Or. at 85-88, 106 P.3d 627. Here, by contrast, Sweet's diagnosis of a personality disorder with borderline, dependent, and narcissistic features is supported by the ample evidence of mother's persistent inability to recognize and address child's needs. The only other examining psychologist who testified about mother reserved diagnosis of a personality disorder (having spent a total of only three hours with mother), but observed many of the same deficits noted by Sweet. Further, mother's lack of progress in her parenting skills likewise went beyond any one incident of failing to listen to child or cutting off child in her attempt to tell a story. We recognize that mother is not required to be a perfect parent or to somehow demonstrate that all traces of child's former concern for mother have been eliminated. Nevertheless, the record, taken in its totality, is replete with examples of mother's inability to perceive child's needs in the face of the efforts of Waln and others to help mother recognize and address those needs. We are persuaded that, unlike in Smith, the deficiencies perceived here are sufficiently severe as to implicate the standard that the statute sets out for the termination of parental rights.
Accordingly, we find that mother's mental illness, coupled with her history of drug addiction, render mother unfit. Mother's mental illness renders her presently unable to recognize and address child's needs and has contributed to child's unhealthy feelings of responsibility for mother's care. Mother's drug addiction, although apparently under control at the time of trial, caused child significant trauma, and child now has special needs due to the developmental delays and post-traumatic stress disorder that she has suffered as a result. Mother's mental illness renders her incapable of addressing those special needsindeed, of recognizing child's needs at alland her continued denial of the extent and effects of her drug addiction only exacerbate the injury to child and jeopardize mother's potential for long-term recovery.
We note that mother and child are attached to each other and that many of their interactions during the 18 months preceding trial were positive and affectionate. Nevertheless, the witnesses who testified favorably about mother's parenting skills, including the Options visit supervisors, Saunders, Cross, and Dahlem, did not evince an understanding of child's particular needs or the issues with which child was struggling in therapy and in her foster placement. Indeed, Saunders and Cross had very little interaction with child at all. By contrast, we find persuasive the observations of Waln and Portland that child's strong caretaking impulse toward mother leads her to express what mother wants to hear and to mask her true feelings. Ultimately, the evidence of positive interactions between mother and child does not overcome the clear and convincing evidence that mother's mental illness, coupled with her past behavior, are presently detrimental to child.
Having found that mother is unfit, in order to justify termination of her parental rights, we must also find that integration of child into mother's home is improbable within a reasonable time due to conditions not likely to change. Stillman, 333 Or. at 145-46, 36 P.3d 490. Although mother has made considerable improvements, those improvements do not suggest that she has gained any insight into the extent of her mental illness and addiction and their effect on child. Moreover, as Sweet testified, a personality disorder such as mother's is extremely resistant to treatment; even a "very bright, motivated, dedicated client with a very experienced therapist" may see positive change only after a number of years. Mother's failure to make any progress with Waln in addressing mother's inability to recognize and address child's needs, and her persistent failure in drug treatment to acknowledge her addiction and recognize its effects, suggest *85 that it is unlikely that she is capable of gaining, in the foreseeable future, the insight necessary to permanently address those problems. The record does not give any indication that mother is addressing her denial or her lack of understanding of child's needs, or that she is capable of doing so. Accordingly, there is no reason to believe that childwho has already experienced developmental delays, post-traumatic stress disorder, and continuing anxiety about her futurecan be safely integrated into mother's home within a reasonable time.
Finally, we find that termination of mother's parental rights is in child's best interests. Child experienced trauma as a result of her mother's prior conduct that has caused her significant anxiety, delayed her emotional development, and left her with special needs, including the tasks of overcoming her confusion about her responsibilities toward her mother and developing the ability to trust and to form lasting attachments. Child continues to feel responsible for mother's welfare and to struggle to identify and express her actual feelings and needs. She has made improvements in her foster placement; she is beginning to form positive attachments and to be able to identify and express her feelings. Mother has not demonstrated an ability to provide child with an environment in which her needs are recognized and addressed, and it is doubtful that she can do so at all, and certainly not within a reasonable time. Instead, despite the attachment between mother and child, mother continues to deny child's perceptions even to the extent of accusing her of lying. Accordingly, we are persuaded that termination is in child's best interests.
Affirmed.
NOTES
[1] Father has a history of drug addiction and has voluntarily relinquished his parental rights.
[2] Throughout her history, mother has given inconsistent accounts of her drug use. In that particular assessment, mother reported that she used methamphetamine "on one occasion only," at the age of 24, but she gave different accounts on other occasions, as will be seen later. Her treatment at New Directions Northwest also produced a positive result for the opiate Percodan.
[3] Although Hart requested mother's medical records from Washington, he never received them.
[4] Hart dismissed mother as a patient on learning that mother was abusing and overusing her prescriptions.
[5] The juvenile court ultimately took jurisdiction over child in early August 2001.
[6] Mother testified under oath about the "undercover informant" story in the December 2001 hearing and was asked why she did not tell the arresting officers that she was working for the drug task force when they came to arrest her for possession of methamphetamine. She testified, "Yeah, I panicked. And also, I'm not used to having drugs in my possession, and so I actually forgot it was there. * * * I was being very honest."
[7] Mother ultimately did not enter treatment in Portland and became angry with DHS for moving child to Lake Oswego because it made her visitations more difficult. Over time, it also appears that mother did not like the Stubblefields and frequently questioned their decisions regarding child.
[8] Dahlem likewise came to have a very volatile relationship with DHS and with mother's treatment providers. For example, Schacher, the program manager at New Directions Northwest, indicated that Dahlem appeared to "have the same manipulative behaviors that [mother] has" and that she seemed to be mother's "chief enabler." Mother often insisted that DHS or treatment providers deal with Dahlem.
[9] For example, in one visit child quizzed mother about mother's smoking cessation program and wanted details about mother's progress. The visit supervisor interrupted to tell them that it was not a topic that child should be worried aboutand although mother responded, "I was just about to tell her that," she proceeded to provide child with details and described child as her "cheerleader." Although any one instance of child's concern for mother can be explained away and in some children might not even be a cause of worry, the persistence of such instances in the record here supports the view of those who treated child that her concern for mother's welfare extends well beyond the level that can be considered healthy for child.
[10] That statute provides that DHS must file a petition to terminate the parental rights of a parent whose child "has been in substitute care * * * for 15 months of the most recent 22 months" unless "[t]here is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child." ORS 419B.498. Such compelling reasons include, as relevant here, the parent's "successful[] participati[on] in services that will make it possible for the child * * * to safely return home within a reasonable time * * *." Id.
[11] Mother emphasizes that Dr. Condon, a psychologist who evaluated her at her attorney's request two months before trial, stopped short of diagnosing mother with a personality disorder. However, Condon saw mother for a total of only three hours and had only a limited history to inform his evaluation, relying primarily on mother's own incomplete account (although he also had read the evaluations of Waln, Sweet, and Portland). The information he reviewed omitted some of mother's drug history and much of the instability in mother's pastand, in any event, Condon concluded not that mother did not have a personality disorder, but rather that he did not have enough information to make such a diagnosis. Moreover, his evaluation in many respects echoed Sweet's evaluation, noting that mother gave "detailed, overly elaborate explanations" for many events and "attempted to portray herself as exceptionally free of common shortcomings to which most individuals will admit." Condon also based his opinion in part on the findings of the Citizens Review Board (CRB), which had recommended that DHS change its plan to "return to parent" after the court had approved the decision to proceed to termination. However, he was not aware of whether the CRB hearing involved sworn testimony and other safeguards that apply in court hearings, and the CRB report reflects that the CRB largely accepted mother's view of critical events.
[12] Waln noted that, during one visit between child, mother, Dahlem, and Dahlem's daughter Shelby, mother and Dahlem had attempted to prove that child was not afraid of Dahlem by lavishing all of their attention on child while "painfully and abusive[ly] rejecting [Shelby's] efforts for attention, inclusion, and affection." Waln expressed concern that "[s]uch rejection of one child is not lost on the other child and is a powerful warning of like treatment in the future."
[13] Mother also told Condon, the psychologist hired by her attorney to evaluate her, that she had abused only Oxycontin and had been clean and sober since January 2001.
[14] We note that child's attorney at trial supported termination and indicated that child wished to remain in her current placement. Given child's clear attachment to and concern for mother, the fact that she apparently does not want to return to mother's care is significant and supports the views of Waln and Portland that child's expressions of wanting to stay with mother were placating behavior, expressions of concern for mother rather than expressions of her true preference.